Argued and submitted October 31, 2007, affirmed on appeal; cross-appeal dismissed as moot May 21, petition for review allowed September 12, 2008 (345 Or 301)

## STATE OF OREGON,
*Plaintiff-Appellant, Cross-Respondent,*

*v.*

## ANTHONY DOUGLAS KIRKEBY,
*Defendant-Respondent, Cross-Appellant.*

Yamhill County Circuit Court
CR030112; A128263

185 P3d 510

Robert M. Atkinson, Assistant Attorney General, argued the cause for appellant - cross-respondent. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Shawn Wiley, Senior Deputy Public Defender, argued the cause for respondent - cross-appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

In this criminal action, the state appeals the trial court's pretrial order suppressing drug evidence obtained during a consensual search of defendant's person during a traffic stop. ORS 138.060(1)(c). The issue presented to us is whether the police officer's request for consent to search defendant constituted an unlawful extension of the traffic stop in violation of Article I, section 9, of the Oregon Constitution.[1] Defendant cross-appeals the court's pretrial ruling that denied his motion to exclude evidence of a field test of drugs that were discovered as a result of the search. We affirm on appeal, *State v. Rodgers*, 219 Or App 366, 182 P3d 209 (2008), and dismiss the cross-appeal as moot.

■ We review the lawfulness of searches and seizures for legal error and are bound by the trial court's findings of historical fact to the extent that those findings are supported by evidence in the record. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

The trial court found the facts to be those to which Deputy Sheriff Steele testified at the suppression hearing. On the afternoon of February 6, 2003, Steele saw defendant driving in downtown Willamina. He knew defendant by sight and also knew that defendant's driver license had been suspended. Steele contacted his dispatcher who confirmed that defendant had a suspended license. The dispatcher also reported that defendant did not have any outstanding arrest warrants. Based on the driving while suspended violation, ORS 811.175, Steele activated the overhead lights on his patrol car and stopped defendant. The overhead lights remained on throughout the duration of the encounter. Both defendant and Steele got out of their cars and walked toward one another. Steele testified that he was concerned for his safety because defendant had left his vehicle, which raises the risk of danger to an officer.

When Steele told defendant that he had stopped him for driving while suspended, defendant seemed surprised

---

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

and handed him an Oregon driver license. Defendant was cooperative and "businesslike"; he did not act in a threatening or aggressive manner. Steele also indicated that, during his extensive history of prior contacts with defendant, defendant had never acted in a violent or threatening manner and had never pulled a weapon. At that point in the encounter, Steele had defendant's name, date of birth, and driver license number. He acknowledged that that was all the information that would be contained on a traffic citation; however, he testified that he "probably" did not have everything he needed to issue the citation, because he had not requested and received from defendant the vehicle registration and proof of insurance.

Steele explained to defendant that "the license that he was handing me was no good" and asked defendant if he had any weapons on him or in the car. Steele explained why he asked about the presence of weapons:

> "Once again he was outside the car and it was pertinent. For officer safety I wanted to know if he had any weapons on him and there was a passenger still in the vehicle and so I was asking if there was any weapons in the vehicle also. Because really now I had two people and they were in different locations and I needed to kind of know what was going on and who had what if anything."

Defendant stated that he did not have any weapons. Steele then asked defendant for "consent to a pat search for weapons." The trial court found that approximately two minutes had elapsed between the initial stop and that request. Steele had not yet written defendant a citation. At some point during the encounter—although it is unclear precisely when—two additional officers arrived on the scene. Those officers were "watching the passenger" for Steele as he talked with defendant.

During the patdown search, Steele felt miscellaneous items in defendant's pockets. After the patdown, Steele "felt fairly confident that [defendant] didn't have any firearms on his person." He nonetheless asked defendant for consent to look at each of the items that he had felt, because he did not know what they were and "wanted to investigate further." For each item, consent was granted. Steele testified

that defendant was not free to leave during the encounter; he also did not tell defendant that he was free not to cooperate. One of the items that Steele had felt was a small metal cylindrical container. Steele asked defendant if he could look inside it. Defendant first responded, "I just found that." Steele again asked for consent to look inside, and defendant agreed. Steele unscrewed the cap and saw two zip lock baggies containing a residual amount of a clear crystalline substance that appeared to be methamphetamine. At that point, Steele concluded that he had probable cause to believe that defendant had committed the crime of possession of a controlled substance, and he arrested defendant for that crime. At that point, approximately four to five minutes had elapsed from the beginning of the stop.

Defendant was thereafter charged with possession of a controlled substance, *former* ORS 475.992 (2003). Before trial, defendant moved to suppress the evidence obtained during the search. He argued that, although questions concerning the presence of weapons may be permitted under ORS 810.410(3)(d),[2] unless the officer has "a reasonable suspicion of an *immediate threat of serious injury*," that questioning—including asking for permission to search for weapons—constitutes an unlawful seizure in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. (Emphasis in original.) According to defendant, because there was no such threat in this case and because his consent was obtained as a

---

[2] ORS 810.410 provides, in part:

"(3) A police officer:

"(a) Shall not arrest a person for a traffic violation.

"(b) May stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation.

"(c) May make an inquiry into circumstances arising during the course of a detention and investigation under paragraph (b) of this subsection that give rise to a reasonable suspicion of criminal activity.

"(d) May make an inquiry to ensure the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

"(e) May request consent to search in relation to the circumstances referred to in paragraph (c) of this subsection or to search for items of evidence otherwise subject to search or seizure under ORS 133.535."

result of the resulting unlawful seizure, the evidence must be suppressed. The state countered that the officer's request for consent to search defendant was not unlawful because the officer had legitimate officer safety concerns and because "it [was] a consent search, which the officer [was] authorized [under ORS 810.410(3)(e)] to conduct at that point." The state also argued that defendant was not unreasonably detained beyond "what was necessary" because the search occurred within a few minutes of the stop and during the course of the investigation of the traffic violation.

The trial court granted defendant's motion to suppress. The court first concluded that none of the officer's conduct violated ORS 810.410. However, relying on *State v. Amaya*, 336 Or 616, 89 P3d 1163 (2004), and *State v. Ehret*, 184 Or App 1, 55 P3d 512 (2002), the court further concluded that Steele's request for consent to frisk defendant was nonetheless unlawful under Article I, section 9, because it amounted to a seizure of defendant without reasonable suspicion that defendant posed a danger to the officer or others or that he had committed a crime. The court reasoned that, although not every question by an officer that is unrelated to the reason for a traffic stop raises constitutional concerns, the request for consent to do a patdown, because it is "significantly beyond that accepted or ordinary social conduct intercourse" and would not "be perceived as non-offensive contact if it occurred between two ordinary citizens," unlawfully extended the duration of the traffic stop in violation of Article I, section 9, because it was not justified by a reasonable suspicion that defendant posed an immediate threat to the officer's safety. This appeal by the state followed.

The state does not argue on appeal that Steele had a "reasonable suspicion, based upon specific and articulable facts," that defendant posed "an immediate threat of serious physical injury to [him]." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987); *see also Amaya*, 336 Or at 631. Rather, as was clarified at oral argument, the state's argument is that, at the time that he asked defendant for permission to pat him down, Steele was, in some general sense, "concerned with his safety"—a "concern" that did not rise to the constitutionally independent and sufficient *Bates* level—and, because of that concern, was authorized under ORS 810.410(3)(d) to make

inquiries of defendant that were unrelated to the traffic stop, including asking him for consent to search his person. *See* ORS 810.410(3)(d) (authorizing inquiries, including an inquiry regarding the presence of weapons, to "ensure the safety of the officer, the person stopped or other persons present"). According to the state, the statute authorizes "officer safety requests like the one made here," made during the course of a traffic stop, even though they "likely will have the effect of extending the duration of the stop for some minimal period of time."[3] In the state's view, as we understand it, any delay caused by the request in this case therefore did not amount to a seizure for purposes of Article I, section 9, but rather was a product of defendant's valid consent.

■■ We turn to defendant's arguments on appeal. First, we note that defendant does not argue on appeal, as he did below, that Steele's initial question about the presence of weapons constituted a seizure under Article I, section 9. *See State v. Crampton,* 176 Or App 62, 72, 31 P3d 430 (2001), *overruled on other grounds by State v. Caldwell,* 187 Or App 720, 69 P3d 830 (2003), *rev den,* 336 Or 376 (2004) (holding that an officer's inquiry into the presence of weapons, as authorized by ORS 810.410(3)(d), does not transform a police-citizen encounter into a separate stop in violation of Article I, section 9). Rather, defendant argues that the unlawful seizure arose when Steele requested permission to frisk him after he said that he did not have any weapons and to examine the items in his pockets after the patdown search yielded no weapons. Defendant contends that, even if those requests for consent to search were authorized under ORS 810.410, they violated his rights under Article I, section 9, because they were not based on a reasonable suspicion that he posed a threat of immediate harm to an officer.[4] Because his consent was obtained in exploitation of that illegality, he

---

[3] As the state correctly points out, in this case the time between the initial stop and the request for consent to search defendant was only two minutes.

[4] As he did in the trial court, defendant also relies on the Fourth Amendment. Because we resolve the case on state law grounds, we need not reach defendant's federal constitutional claim. *See State v. Kennedy,* 295 Or 260, 262, 666 P2d 1316 (1983) (court considers all questions of state law before reaching federal constitutional claims).

continues, the evidence obtained during the search is subject to suppression.

With the parties' arguments thus framed, the dispositive question is whether, even assuming that Steele's actions were permissible under ORS 810.410(3), his requests for permission to search defendant nonetheless amounted to an unlawful seizure under Article I, section 9. We agree with the trial court that they did.

■ ■ First, as the Supreme Court explained in *Amaya*, ORS 810.410(3)(d) authorizes an officer conducting a lawful traffic stop to make inquiries, including inquiries about the presence of weapons, even if the officer does not reasonably suspect criminal activity or the threat of immediate harm. 336 Or at 625. However, the court also made clear that an officer's actions, even if authorized by the statute, may in certain circumstances further restrain a person's liberty such that they effect a "seizure" under Article I, section 9. *Id.* at 626-27. In those circumstances, the officer's actions must be supported by a reasonable suspicion of criminal activity or that " 'the citizen might pose an immediate threat of serious physical injury to the officer or to others then present.' " *Id.* at 631 (quoting *Bates*, 304 Or at 524).[5]

■ After this case was briefed and argued, we decided *Rodgers*, 219 Or App at 366, in which we explored the circumstances under which an officer's questions may constitute a seizure under Article I, section 9. We explained that a police officer's questioning of a person unrelated to the initial, legal stop can result in an unlawful restraint of the person's liberty in violation of Article I, section 9, in two situations: (1) when an officer concludes the lawful stop and then reinitiates a second stop by questioning the person about unrelated matters without reasonable suspicion; and (2) "when the officer, without letting the person know expressly or by implication that he or she is free to leave, detains the person beyond the time reasonably required to investigate the traffic infraction and issue a citation." 219 Or App at 371; *see also Ehret*, 184 Or

---

[5] In *Amaya*, the court did not decide whether the officer's questioning of defendant constituted a seizure, because it determined that it was, in any event, permissible under Article I, section 9, because the officer had a reasonable suspicion that defendant posed an immediate threat of serious injury to him. 336 Or at 631.

App at 8-10 (traffic stop was unlawfully extended when officer, after having completed traffic citations, delayed giving them to defendant, and instead questioned him about his criminal history and whether he had any drugs in his car, without reasonable suspicion that defendant had engaged in criminal activity).

*Rodgers* presented the second factual scenario. In that case, the defendant was lawfully stopped for the traffic infraction of driving a car with a burned-out license plate light. The officer obtained the defendant's driver license and vehicle registration and ran a records check, which came back clear. Instead of issuing the defendant a citation, which the officer could have done at that point, he began questioning the defendant about items in the defendant's car, which the officer believed indicated that the defendant was involved in the manufacturing of methamphetamine. After talking for a few minutes, the officer asked the defendant for consent to search the car. The results of that search led to the defendant's conviction for unlawful manufacture of methamphetamine. 219 Or App at 368-69.

We rejected the state's argument that the reasonableness of the duration of the traffic stop should be measured by the time that it would have taken the officer to process the citation had he or she not engaged in the additional, unrelated questioning. *Rodgers*, 219 Or App at 373. Instead, we determined that prior decisions of this court and the Supreme Court led to the conclusion that,

> "although an officer is free to question a motorist about matters unrelated to the traffic infraction during an unavoidable lull in the investigation, such as while awaiting the results of a records check, that officer is not similarly free to question the motorist about unrelated matters as an alternative to going forward with the next step in processing the infraction, such as the writing or issuing of a citation. When an officer has all of the information necessary to issue a citation but instead delays in processing it or in telling the motorist that he or she is free to go, the stop is no longer lawful unless the officer has reasonable suspicion of further criminal activity."

*Id.* at 372 (discussing *State v. Raney*, 215 Or App 339, 345, 168 P3d 803 (2007), *modified on recons*, 217 Or App 470, 175

P3d 1024 (2008); *State v. Boatman*, 185 Or App 27, 34, 57 P3d 918 (2002); *Ehret*, 184 Or App at 3-5, 10). We therefore held that, because the officer had all of the information that he needed to issue a citation when he began questioning the defendant about things unrelated to the burned-out license plate light, he unlawfully extended the duration of the stop beyond the time reasonably required to investigate and cite defendant for the traffic infraction. *Rodgers*, 219 Or App at 373.

This case is controlled by *Rodgers*. At the point at which Steele asked defendant for permission to search him, Steele testified that, although he had defendant's name, date of birth, and driver license number, he "probably" did not have everything he needed to issue defendant a citation because he did not have defendant's proof of insurance and vehicle registration information. However, even if that information was essential for the issuance of a traffic citation, there is nothing in the record to indicate that Steele asked defendant for those items or was waiting for defendant to retrieve them, nor that he was engaged in any other steps related to the investigation of the traffic offense. Thus, the request for consent to search defendant did not occur "during an unavoidable lull in the investigation." *Rodgers*, 219 Or App at 372.

Instead of asking defendant for that information—a logical next step in processing the infraction—Steele proceeded down an unrelated path, that is, he asked defendant for permission to pat him down.[6] That, in turn, led Steele to ask defendant for consent to examine the items that Steele felt during the patdown, and, ultimately, for consent to look inside one of those items. Those actions, which were unrelated to the basis for the traffic stop, unlawfully extended the duration of the traffic stop in violation of Article I, section 9.

Contrary to the state's assertion, our decision in *Raney*, 215 Or App at 341, does not compel a different conclusion. In *Raney*, we concluded that the officer's request for consent to search defendant's car during a traffic stop was not an

---

[6] Throughout the encounter with defendant, the overhead lights on Steele's patrol car remained activated, and Steele testified that defendant was not free to leave.

unlawful extension of the stop. However, in that case, the record supported the trial court's findings that the officer at the time was still in the process of investigating the traffic violation because he was waiting for the computer to verify the status of defendant's driver license and was unable to complete the traffic stop until that information came back. *Id*. at 345. Thus, the request for consent in *Raney* occurred during an "unavoidable lull" in the investigation. *Rodgers*, 219 Or App at 372. Here, in contrast, at the time that Steele asked for consent to frisk defendant, he was not waiting for further information or in some way "unavoidably" prevented from taking the steps necessary to complete the traffic stop. Under those circumstances, Steele's requests for consent to search defendant—without reasonable suspicion of criminal activity or that defendant posed an immediate threat of serious physical injury to him or another person—constituted an unlawful seizure in violation of Article I, section 9.

 Under *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), evidence derived from a consensual search is subject to suppression if the consent was the product of unlawful police conduct. "After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Id*. at 34-35. Here, defendant has shown the required nexus—that is, if not for the unlawful seizure, Steele would not have been in a position to request defendant's consent to the patdown. The state does not advance any argument to satisfy its burden under *Hall* that there were intervening circumstances or factors that severed the connection between the unlawful stop and defendant's consent. Therefore, the trial court did not err in suppressing the evidence obtained during the search.

In his cross-appeal, defendant challenges the trial court's denial of his motion to exclude evidence of the officer's field testing of the drugs discovered during the search. Our conclusion on appeal that the drug evidence was properly suppressed obviates any need for us to reach defendant's cross-appeal. Accordingly, we dismiss the cross-appeal as moot.

Affirmed on appeal; cross-appeal dismissed as moot.