Argued and submitted July 30, 2013, reversed and remanded June 10, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JASMINE SHREE KIMMONS,
*Defendant-Appellant.*

Multnomah County Circuit Court
101253979; A148641

352 P3d 68

Laura E. Coffin, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jennifer S. Lloyd, Attorney-in-Charge, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Douglas F. Zier, Senior Assistant Attorney General.

Before Nakamoto, Presiding Judge, and Haselton, Chief Judge, and Egan, Judge.*

HASELTON, C. J.

_____

* Haselton, C. J., *vice* Armstrong, P. J.

## HASELTON, C. J.

Defendant appeals a judgment of conviction for two counts of unlawful possession of a firearm and two counts of possession of a loaded firearm in public. Defendant was charged after the police, having stopped her on suspicion of trespassing by remaining in a privately owned parking lot without paying to park, obtained consent to search her car and found two handguns in its locked glove box. On appeal, defendant asserts, *inter alia*, that the trial court erred in denying her motion to suppress the handguns and other evidence, because that evidence was the product of an extension of the stop, which constituted an unlawful seizure of defendant's person. In response to that challenge, the state asserts only that defendant was not seized unlawfully. For the reasons explained below, we agree with defendant that the police unlawfully extended the stop to investigate unrelated matters. Accordingly, we conclude that the trial court erred in denying the motion to suppress, and we reverse and remand.[1]

We review the trial court's denial of defendant's motion to suppress for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). In doing so, we are bound by the trial court's express and implicit factual findings so long as those findings are supported by sufficient evidence in the record. *Id.* We state the material facts, which are undisputed, in accordance with that standard.[2]

On the night of December 24, 2010, members of the Portland Police Department's Gang Enforcement Team were monitoring the Old Town neighborhood in downtown Portland. They learned that a number of gang members and associates had gathered at a nightclub for a birthday party. The police were concerned that the situation might

---

[1] Defendant also contends that (1) the initial stop was unlawful; (2) the search of the locked glove box exceeded the scope of her consent to search; and (3) the trial court erred by failing to merge the four guilty verdicts into convictions on one count of unlawful possession of a firearm and one count of possession of a loaded firearm in public. We reject the first contention without written discussion, and our analysis and disposition obviate any need to address the other two.

[2] The facts are drawn from the trial court's extensive findings and police testimony at the suppression hearing, which the trial court credited.

become violent; that concern was based on their knowledge that gang members often carry weapons on their persons or stow them in cars, as well as a history of gang activity in the area, including the fact that there had been a fatal gang-related shooting three months before.

Officers observed several "known gang members" leave the nightclub and head toward a nearby parking lot, where signs directed drivers to pay to park. The officers, aware that the parking lot had previously been the scene of "several large fights" and shootings, thought that the group might be retrieving weapons from a car.

The group got into a silver Buick that was parked in the lot. After sitting in the car for a few minutes, they got out and returned to the nightclub. The officers noted that the silver Buick remained in the parking lot, but did not appear to display a ticket stub showing that its driver had paid to park in the lot.

A group of four officers then approached the car. Defendant, its sole occupant, was in the driver's seat. Officer Asheim asked defendant what she was doing there and whether she had a ticket to park in the lot, and defendant responded that she was waiting for a girlfriend to come back from the nightclub and admitted that she had not paid for parking. Asheim asked defendant for her driver's license and insurance. Defendant produced her license but not proof of insurance, although she maintained that the car was insured.

Asheim then mentioned the gang presence in the area and told defendant that the officers had just watched several "known gang members" get in and out of her car. Defendant explained that the group had gotten into her car to smoke marijuana but had left because they lacked the necessary paraphernalia. She also said that one of the men was her boyfriend and acknowledged that the group, due to gang associations, had "many known enemies."

At that point, Asheim told defendant that he was concerned that the group had left "[something] in the car that could hurt us," and asked if defendant would allow police to search it for such items. Defendant responded, "If

you want to check, then go ahead," and got out of the car. Asheim directed her to stand off to the side with another officer. Defendant was searched and frisked, but no weapon or anything of interest was discovered on her person. When Asheim sought confirmation from defendant that she was consenting to a search of "anywhere" in the vehicle, defendant waved her hands and said, "Go ahead."

Two other officers proceeded to search the car. When they realized that the glove box was locked, they so informed Asheim, who was standing off to the side with defendant. He asked defendant about the key, and she said that she did not know where it was. At the same time as that exchange was occurring, another officer continued to attempt to look into the glove box, "even though he could not open it without keys." The officer was able to "pry open the glove box sufficiently to open it a crack" and "immediately saw the handle of a gun." At that point, the officers arrested defendant. They searched her purse, found the keys to the glove box, and used them to open the glove box, where they found two loaded handguns.

Based on the recovery of that evidence, the state charged defendant with two counts of unlawful possession of a firearm, ORS 166.250, and two counts of possession of a loaded firearm in public, Portland City Code 14A.60.010.[3]

Defendant moved for suppression of all evidence discovered pursuant to the search, seizure, and questioning of defendant during those events, including, but not limited to, defendant's statements, the officers' observations, the two handguns, and any ammunition. At the suppression hearing, she asserted, among other things, that (1) the predicate stop was unlawful as unsupported by reasonable suspicion, specifically as to criminal trespass for parking in the lot without paying; and (2) even if the predicate stop

---

[3] ORS 166.250(1) provides, in relevant part, that "a person commits the crime of unlawful possession of a firearm if the person knowingly *** [p]ossesses a handgun that is concealed and readily accessible to the person within any vehicle."

Portland City Code 14A.60.010 makes it unlawful "for any person to knowingly possess or carry a firearm *** in a vehicle in a public place, recklessly having failed to remove all the ammunition from the firearm."

were lawful as founded on reasonable suspicion of criminal trespass, the request for consent to search for weapons effected an unlawful extension of that stop, in violation of Article I, section 9, of the Oregon Constitution, because it related to investigation of unrelated matters for which the police lacked reasonable suspicion. Defendant specifically asserted that suppression of the resulting evidence was required, because her consent to the search derived directly from a seizure that was unconstitutional pursuant to *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010), and related authority.

The state's only response before the trial court with respect to defendant's second, "unlawful extension" contention was that there had been no unlawful extension of the stop because, as of the time Asheim elicited defendant's consent, the police reasonably suspected her of unlawfully possessing weapons, based on "the area, the time, the known gang members, and the recent shootings." We reiterate: That was the state's *sole* response. Critically to our review and to the analysis that follows, the state did not, at any point during the suppression hearing, contend that the request for consent to search was independently justified by officer safety concerns. Consistently with that understanding, the state, in opposing the suppression motion, did not elicit any testimony from the investigating officers that they perceived defendant (as opposed to the "known gang members" who were no longer on the scene) to have posed a threat to their safety.

The trial court denied the motion to suppress, concluding that the officers were entitled to request consent to search for weapons and that defendant's consent to that request obviated any concern that the stop had been extended unlawfully. In so holding, the court framed the request for consent to search for weapons as a constitutionally permissible "inquiry":

"[T]here is no Constitutional problem if the police make an inquiry unrelated to a stop that—during the course of a routine stop that does not delay the stop.

"Subsequent cases [after *State v. Hall*, 238 Or App 75, 241 P3d 757 (2010), *rev den*, 349 Or 664 (2011),] allow

requests to search a vehicle during an unavoidable lull in the stop. I don't have testimony that is sufficient to establish that this was an unavoidable lull. It seemed to follow directly on the heels of confronting the defendant about her failure to have a parking ticket to park in that lot. The officers then proceeded immediately to request consent and consent was given.

"Whether that inquiry is impermissible is a difficult question. I conclude under Oregon law, under *Hall* and *[State v.] Amaya*, [176 Or App 35, 29 P3d 1177 (2001), *aff'd on other grounds*, 336 Or 616, 89 P3d 1163 (2004),] that it is not impermissible under these circumstances. So the officers were entitled to ask for her consent to search and she gave consent. It was broad consent. She gave the consent to search anywhere in the vehicle."

After defense counsel asked that the trial court clarify its findings with respect to whether the officers had, in fact, extended the duration of the stop, the trial court explained:

"My finding is that the request for consent to search the vehicle was—was unrelated to the original reason for the stop, but it occurred during a routine stop and did not delay that stop, at least the request itself.

"The search, of course, took some time, but once they had consent, then they were allowed to take that time. So I—the consent was valid. I'm not making a specific finding as to how much time because I don't have any testimony, as I recall, to exactly how long the search took."[4]

Following a bench trial, the trial court found defendant guilty of all charges.

---

[4] We note that, although the trial court did not explicitly reject the state's argument that the request to search was legal because the police reasonably suspected defendant of a weapons-possession related crime, the court's remarks, by necessary implication, foreclosed any possibility that it adopted the state's construct. When the prosecutor argued that defendant's "association" with gang members showed that the police reasonably suspected defendant of unlawful possession of weapons, the trial court interjected that there was no evidence that defendant was in a gang and that "[w]e haven't quite gotten to the stage yet where you're guilty by association, so you've got to have more than that." Later, when defense counsel in rebuttal began to address the lack of reasonable suspicion for unlawful weapons possession, the trial court prompted counsel to move on to other issues, remarking that counsel was "picking the low hanging fruit."

On appeal, defendant challenges the denial of the motion to suppress. Invoking *Rodgers/Kirkeby* and its progeny, defendant argues, as she did before the trial court, that the police impermissibly extended the duration of the predicate stop by eliciting consent to search for weapons without reasonable suspicion that defendant had committed any offenses pertaining to weapons possession.

The state, for its part, does not rely on the contention that it raised and developed before the trial court.[5] Nor, as nearly as we can discern, does the state embrace and defend the trial court's rationale for denying suppression. Rather, on appeal, the state posits—presumably as putative alternative bases for affirmance—two new, and qualitatively different, propositions to establish the lawfulness of the request for consent to search. First, the state contends that defendant's "unlawful extension" argument "is based on her mistaken application of the law relating to non-criminal traffic stops to criminal stops." Second, the state contends that, in all events, any extension of the stop was a "legitimate officer safety measure," because the police had "reasonable concern that defendant had weapons in her car."

Our accustomed, prudential practice is to first address a trial court's reasoning and then, if necessary, turn to proffered alternative bases for affirmance. Here, however, analytical coherence—"clearing the decks"— counsels that we transpose that order. For the reasons that follow, we reject the state's first alternative contention as legally incorrect, and we decline to consider the second as failing to satisfy the requisites for review of alternative grounds for affirmance, as prescribed in *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001).

We reject the state's threshold contention that, because defendant was stopped for a criminal matter (criminal trespass) rather than for a traffic offense, the request

---

[5] The state's answering brief includes a single, unadorned statement that the police "reasonably suspected" the presence of weapons in defendant's car. However, that reference is made solely in the context of the state's argument as to its "officer safety"-based alternative ground for affirmance, which we describe below. 271 Or App at 600.

for consent to search pertaining to a matter unsupported by reasonable suspicion did not effect an unlawful extension of the stop and, concomitantly, an unconstitutional seizure. To be sure, our cases in this context have typically involved traffic stops. However, the principles that the Supreme Court amplified in *Rodgers/Kirkeby* are categorical, as a constitutional matter and, thus, apply, across the "infinite variety of encounters between law enforcement officers and citizens," *State v. Holmes*, 311 Or 400, 406, 813 P2d 28 (1991), to "seizures" generically.[6] *See* 271 Or App at 600-02.

*State v. Hendon*, 222 Or App 97, 194 P3d 149 (2008), is exemplary. There, the defendant, a pedestrian, was initially stopped for trespassing after an officer observed him bypass various physical barriers at a north Portland MAX station (a fence, a chain, and train tracks), in violation of posted signs. After asking the defendant "if he had any 'dope,'" which the defendant denied, the officer requested and obtained consent to search his person for drugs, and found a plastic bag containing methamphetamine. *Id*. at 99-100. The defendant, who sought suppression of that evidence, conceded that the initial stop was lawful, but maintained that the officer had unlawfully prolonged the stop by requesting consent to search. *Id*. The trial court rejected that argument, and the defendant was convicted of possession of a controlled substance.

On appeal, we concluded—pursuant to *Rodgers/Kirkeby* and related cases—that

> "there is no evidence in this case that the request to search occurred during an 'unavoidable lull' in the investigation for trespass. In consequence, the state has not established that [the officer] did not detain defendant beyond the time reasonably necessary to investigate the initial lawful basis for the stop, and we must conclude that [the officer] unlawfully prolonged the duration of the stop when he asked defendant to consent to a search without reasonable suspicion of other criminal activity."

---

[6] We note, parenthetically, that, notwithstanding the trial court's stated reliance on *Rodgers/Kirkeby* ("I draw guidance from recent Supreme Court decisions in *Rodgers* and *Kirkeby*"), the state did not object to the trial court's application of that framework in these circumstances.

*Id.* at 106. *Hendon* is materially indistinguishable from this case. *See also State v. Klein*, 234 Or App 523, 228 P3d 714 (2010) (where lawful traffic stop for biking at night without lights or reflectors gave rise to reasonable suspicion that the defendant possessed burglary tools, the stop was unlawfully extended when officers requested and obtained consent to search the defendant's person for drugs without reasonable suspicion to believe that the defendant possessed drugs).[7]

The state's second, "officer safety" alternative basis for affirmance is unavailing as unreviewable. As noted above, 271 Or App at 596, the state never advanced an "officer safety" rationale for the extension of the stop before the trial court. Had the state raised that issue, defendant "might have created a different record below * * * and that record could affect the disposition of the issue." *Outdoor Media Dimensions Inc.*, 331 Or at 659-60 (describing and prescribing requisites for affirming a trial court's decision on alternative grounds); *see also State v. Alexander*, 255 Or App 594, 601, 298 P3d 55 (2013) (rejecting proffered alternative basis for affirmance: "If the state had timely raised its present alternative contention, the record on that potentially dispositive matter might well have developed differently."). Accordingly, the record is not sufficiently developed to support that argument as a possible alternative ground for affirmance.

Our consideration thus narrows to whether the trial court erred in concluding that the stop was not unlawfully extended. We begin with an overview of the applicable legal principles. "Seizures or searches for evidence to be used in a criminal prosecution, conducted without a warrant or without an exception to the warrant requirement, violate Article I, section 9[.]" *Rodgers/Kirkeby*, 347 Or at 623. A

---

[7] Other cases apply the *Rodgers/Kirkeby* framework in the context of initial stops for a noncriminal traffic violation where police subsequently develop reasonable suspicion of a more serious, criminal vehicular offense. *See, e.g., State v. Maciel*, 254 Or App 530, 295 P3d 145 (2013) (where original and emergent purposes for traffic stop were supported by reasonable suspicion of speeding and possessing a stolen vehicle, officers unlawfully detained the defendant to investigate drug offenses without reasonable suspicion); *State v. Kentopp*, 251 Or App 527, 284 P3d 564 (2012) (police unlawfully extended traffic stop to investigate drug possession, even assuming that the police reasonably suspected the defendant of other crimes including car theft and attempting to elude a police officer).

temporary restraint of a person's liberty for the purpose of criminal investigation—*viz.*, a stop—qualifies as a seizure, and, therefore, must be justified by a reasonable suspicion of criminal activity. *Id.* at 621; *Ehly*, 317 Or at 79-80. For that reason, police may not unreasonably delay, or extend the duration, of an otherwise lawful stop to investigate unrelated matters for which they lack reasonable suspicion, *Rodgers/Kirkeby*, 347 Or at 621-24, but investigations into unrelated matters that occur during an "unavoidable lull" are permissible, *Hall*, 238 Or App at 77.

Consistently with those principles, a stop is unlawfully extended, effectuating an unconstitutional seizure, where

> "an officer, without letting the person know expressly or by implication that he or she is free to leave, detains the person beyond the time reasonably required to investigate the initial basis for the stop and to issue a citation, without the requisite reasonable suspicion."

*State v. Huggett*, 228 Or App 569, 574, 209 P3d 385 (2009), *rev dismissed*, 348 Or 71 (2010) (citations omitted).

Applying those principles to the circumstances in this case, we conclude that the police unlawfully extended the stop. It is undisputed that defendant was "seized" throughout the entire encounter, beginning with Asheim's initial inquiries of defendant after the four officers approached (and surrounded) her car. As of the time that Asheim requested, and obtained, defendant's consent to search the car for "anything in the car that could hurt [the officers]," the only offenses for which the police had reasonable suspicion were criminal trespass, based on defendant having parked in the parking lot without paying,[8] and driving uninsured, based on defendant's inability to provide proof of insurance. Rather than proceeding with those matters, through pertinent inquiries or issuance of citations (or possible arrest for criminal trespass), the police, instead, sought consent to search for items unrelated to those matters. Because—and this is undisputed—the request did not occur during

---

[8] ORS 164.245(1) provides that "[a] person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully in a motor vehicle or in or upon premises."

an "unavoidable lull" as to the investigation and processing of defendant's possible criminal trespass, or any insurance related violation—that conduct effected an unconstitutional seizure. *Rodgers/Kirkeby*, 347 Or at 621; *Hendon*, 222 Or App at 106; *Klein*, 234 Or App at 532.

The only remaining issue is whether the handgun evidence should be suppressed under the methodology outlined in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and modified by *State v. Unger*, 356 Or 59, 333 P3d 1009 (2014). Defendant asserts that suppression is required, because her consent to the search directly derived from the illegal extension of the stop. The state remonstrates, without elaboration, that "no exploitation theory for suppression can be asserted." However, despite the fact that it bears the burden of proving that defendant's consent to the search of her car was sufficiently attenuated from any illegal police conduct, *see Unger*, 356 Or at 84, the state offers no reasoned explanation—or, indeed, any explanation at all—as to why, in the totality of the circumstances of this case, suppression is not required.[9]

We thus conclude that the trial court erred in denying the motion to suppress. Because the suppressed evidence was essential to defendant's convictions, that error was not harmless.

Reversed and remanded.

---

[9] *Unger*, which was decided after this case was argued, left intact *Hall*'s general requirement that the state bears the burden of proof with respect to the exploitation analysis. 356 Or at 84 ("[W]e adhere to *Hall* in requiring the state to prove that the consent was independent of, or only tenuously related to, the illegal police conduct."); *State v. Musser*, 356 Or 148, 150, 335 P3d 814 (2014) ("[W]hen a defendant challenges the validity of his or her consent based on a prior police illegality, the state bears the burden of demonstrating that the consent *** was not the product of police exploitation of that illegality.").

We note that the state did not develop and advance any attenuation-related argument before the trial court, which might plausibly provide a basis for a conditional remand. *See, e.g., State v. Fox*, 165 Or App 289, 995 P2d 1193 (2000) (where the trial court erred by refusing to hold a suppression hearing, and the issue was properly preserved, vacating the judgment and remanding for a suppression hearing, with instructions to reinstate conviction upon the denial of the motion for suppression, or to grant the defendant a new trial if the motion for suppression is granted).